**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| **E.I. DU PONT DE NEMOURS** | : | **CIVIL ACTION** |
| **AND COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 17-1577** |
| | : | |
| **AGFA-GAVAERT NV, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

**Goldberg, J.**                                                                 **August 15, 2018**

## <u>MEMORANDUM OPINION</u>

This patent infringement and breach of contract case arises from a business relationship gone awry. Plaintiff, E.I. du Pont de Nemours and Company ("DuPont"), has filed a Motion for a Temporary Restraining Order and Preliminary Injunction, requesting that I enjoin Defendants, Agfa-Gavaert NV ("the Parent"), Agfa Graphics NV ("the Belgian Subsidiary"), and Agfa Corporation ("the Delaware Subsidiary") from affirmatively using certain materials in a pending patent proceeding in Germany. The Parent and Belgian Subsidiary, both based in Belgium, have filed a Motion to Dismiss pursuant to Federal Rule of Evidence 12(b)(2), contending that I do not have personal jurisdiction over them.

For the reasons that follow, I will grant the Parent and Belgian Subsidiary's Motion to Dismiss and deny DuPont's Motion for a Temporary Restraining Order as moot.[1]

_____

[1] I issued an Order to this effect regarding the Belgian Subsidiary on June 8, 2018. (Doc. No. 122.) I offer this Opinion to explain the basis of that Order.

# I. PROCEDURAL AND FACTUAL BACKGROUND[2]

Although multi-faceted, the dispute between the parties centers around several patents held by the Belgian Subsidiary, including the '759 Patent, which is the subject of this lawsuit.

DuPont filed its original Complaint in the District of Delaware on November 3, 2017, and subsequently filed an Amended Complaint on November 17, 2017.[3] DuPont brings the following causes of action: declaratory judgment of invalidity of the '759 Patent (Count I); declaratory judgment of non-infringement of the '759 Patent (Count II); declaratory judgment of implied license of the '759 patent (Count III); declaratory judgment of equitable estoppel (Count IV); unfair competition claim under Section 43(A) of the Lanham Act, 15 U.S.C. § 1125 (Count V); declaratory judgment of patent exhaustion (Count VI); violation of Delaware Deceptive Trade Practices Act (Count VII); violation of Delaware Consumer Fraud Act (Count VIII); breach of contract and covenant of good faith and fair dealing (Count IX); copyright infringement (Count X); and breach of website terms of use (Count XI).

DuPont filed its Motion for a Temporary Restraining Order and Preliminary Injunction on December 6, 2017. On January 24, 2018, the Parent and Belgian Subsidiary filed a Motion to Dismiss pursuant to Federal Rule of Evidence 12(b)(2).[4]

## A. **The Parties**

DuPont, a corporation that is a wholly owned subsidiary of DowDuPont, Inc., manufactures and supplies Cyrel® Flexographic Printing Plates and Equipment. These plates

---

[2]     The following facts are derived from DuPont's Amended Complaint, unless otherwise noted.

[3]     On May 18, 2017, Chief Judge D. Brooks Smith of the United States Court of Appeals for the Third Circuit designated me as a visiting judge for the District of Delaware, pursuant to 28 U.S.C. § 292(b), to handle this and other Delaware cases.

[4]     Agfa Graphics Ltd. (UK), also named as a Defendant, filed a Motion to Dismiss, however, has since been dismissed. (Doc. No. 120.)

look similar to large rubber stamps and are "used to print color images of flexible labels and packaging for hundreds of everyday items, including potato chip bags, frozen vegetable bags, milk cartons, candy bar wrappers, and cereal boxes." DuPont offers a line of both digital and analog flexographic printing plates suitable for thermal development, as well as corresponding thermal development processing equipment under the trade name Cyrel® FAST. (Am. Compl. ¶¶ 1, 19.)

"AGFA" is the collective name used by DuPont for the Parent, Belgian Subsidiary, and Delaware Subsidiary.[5] The Parent is a Belgian public limited company with its principal place of business in Mortsel, Belgium. DuPont alleges that it is the parent company to several "wholly owned agent-subsidiaries," through which it "centrally operates its Agfa Graphics Division."[6] The Belgian Subsidiary, is a public limited company with its principal place of business in Mortsel, Belgium.[7] It is a wholly owned subsidiary of the Parent, and according to DuPont, operates as "part of, and with and under the dominion and control of [the Parent] and/or

---

[5]   Because the relationship between these Defendants is at issue, where DuPont refers to "AGFA," I will indicate as such in quotations to reflect that this is DuPont's contention.

[6]   The Agfa Graphics division is one of the Parent's three business groups and is the trade name for the "family" of graphics businesses that operate around the world and the products they offer. (Pl.'s Resp., Ex. 7 at AGFA6; id., Ex. 8 at AGFA5725; Defs.' Reply at 3; id., Ex. 1, 282:19-24, 169:7-11.)   The main policy-making body of Agfa Graphics is the Global Management Committee ("the GMC"), which "consists of the President and Vice Presidents of the different departments/regions." (Pl.'s Resp., Ex. 96 at AGFA5750.)

It is not abundantly clear how the Executive Committee ("the ExCo") referenced by DuPont fits in with Defendants' business structure. DuPont first asserts that the senior executives of the three business groups sat with the Parent's CEO on the ExCo, "the top management authority created to manage the global business groups and entities." However, DuPont later states that the "Graphics Executive Committee" ("the ExCo") was the GMC's former name. (Pl.'s Resp. at 2-3.) The documents to which DuPont cites appear to support the first allegation, that the ExCo was the executive management team for the Parent.

[7]   Agfa Graphics NV (the Belgian Subsidiary) has since changed its name to "Agfa NV." (Defs.' Reply at 3.)

[Parent's] Graphics Division."  The Belgian Subsidiary is the assignee of European Patent No. 1

170 121 B1, titled "Direct-to-plate flexographic printing plate precursor" ("the EP '121 patent"),

the German Patent DE 600 00237 T2 ("the German Patent"), and United States Patent No.

6,551,759 ("the '759 Patent").[8]  Finally, the Delaware Subsidiary is a wholly owned subsidiary

of the Parent organized under the laws of Delaware.  DuPont alleges that the Delaware

Subsidiary "operates as part of, and with and under the control of [the Parent] or [the Belgian

Subsidiary], and/or AGFA Graphics Division."  (Id. ¶¶ 2, 4-6, 20-21.)

**B.  Litigation History Between the Parties**

On March 25, 2003, DuPont challenged the EP '121 Patent through what is referred to as

an "Opposition" in the European Patent Office ("the EPO").  On April 26, 2007, the Opposition

Division of the EPO revoked the EP '121 Patent for insufficient disclosure.  The Board of

Appeals of the EPO set aside this decision on July 23, 2010 and referred it back to the

Opposition Division.  On February 1, 2017, the Opposition Division rejected DuPont's request

that it revoke the reinstated EP '121 Patent.  DuPont appealed this rejection on April 19, 2017

and was still waiting for a decision when it filed the Amended Complaint in this case.  (Id. ¶ 22.)

DuPont notified me by correspondence on June 1, 2018 that it had withdrawn its appeal in the

EPO.

In or about 2005, "AGFA," through the Belgian Subsidiary, informed DuPont of its

position that some of DuPont's Cyrel® FAST flexographic printing plates and corresponding

equipment infringed the EP '121 Patent in Europe and the '759 Patent in the United States.

---

[8]        Since the filing of the Motions addressed in this Opinion, the Delaware Subsidiary has
filed a separate motion seeking to amend its Answer.  The proposed Amended Answer reflects
that assignment of the '759 Patent was transferred from the Belgian Subsidiary to the Delaware
Subsidiary on July 2, 2018, and asserts counterclaims for infringement of the '759 Patent.  (Doc.
No. 135; id., Ex. 1.)

DuPont responded that the EP '121 Patent was invalid. DuPont and "AGFA" subsequently began negotiating for a license or sale of the '121 Patent and related patents, however, no agreement was reached and the parties suspended negotiations until the EP '121 Patent appeal was resolved before the EPO. (Id. ¶¶ 23-24.)

DuPont alleges that beginning in 2011, DuPont and "AGFA," through the Delaware Subsidiary, entered into an initial distribution and marketing agreement ("the US Agreement"), which was last renewed and signed in 2016. According to DuPont, the US Agreement authorized "AGFA" as a marketer and distributor in the United States for certain DuPont Cyrel® flexographic plates and equipment. Pursuant to this agreement, "AGFA" agreed to promote, sell, and provide customer service for Cyrel® products. (Id. ¶¶ 27-31.)

DuPont contends that pursuant to the US Agreement, to facilitate the promotion, marketing, distribution, and related support for DuPont's Cyrel® products, DuPont authorized "AGFA" to provide DuPont's written, recorded, and/or digitally available materials to "AGFA's" contractually assigned Cyrel® customers and potential customers, under the following terms and conditions:

> AGFA shall use information regarding the PRODUCTS provided by DuPont, including without limitation promotional and technical literature solely for purposes of performing its obligations hereunder, including but not limited to developing its marketing programs for the Products. AGFA shall make no claims, warranties, statements or representations with respect to the Products other than those set forth in product literature that is provided by DuPont.

These materials included: all customer and authorized distributor accessible Cyrel® sales, marketing, promotional, technical, instructional, safety, product and process information; documents and/or presentations; documents titled "DuPont Cyrel DFR Data Sheet," which is the subject of U.S. Copyright Registration No. TX0008429562, and "DuPont Cyrel Fast Presentation," which is the subject of U.S. Copyright Registration No. TX0008427628; and

"other copyright-protected all-rights-reserved materials" from the DuPont website.  (Id. ¶¶ 31-34; id., Exs. D, M, N.)

The US Agreement originated from a distribution agreement entered into by DuPont and the Harold M. Pitman Company ("Pitman") by which Pitman became a distributor of DuPont's plates.  According to DuPont, "AGFA" purchased Pitman in 2010 and was assigned the distribution agreement as a result of its purchase of Pitman.  (Pl.'s Resp. at 4.)  Defendants contest this allegation, arguing it was the Delaware Subsidiary that acquired Pitman's assets in 2010, the Delaware Subsidiary that was transferred Pitman's distribution agreement with DuPont, and the Delaware Subsidiary that distributed DuPont's plates in the United States pursuant to the US Agreement.  (Defs.' Mot. at 1, 5.)

DuPont alleges that on July 4, 2017, "AGFA," through the Belgian Subsidiary, filed a patent infringement lawsuit against DuPont in Regional Court in Dusseldorf, Germany.  The complaint in Germany asserts that DuPont's Cyrel® FAST DFR plates infringe the German Patent.  The crux of the current dispute and focus of DuPont's injunction request is that the German complaint and written evidence "rel[y] heavily on AGFA's unauthorized reproduction, distribution, and use of DuPont's copyright-protected and other all-rights reserved publications, technical and promotional literature, product-labels and plate-products."  (Am. Compl. ¶¶ 39, 41.)

### C. DuPont's Allegations Regarding Personal Jurisdiction Over the Parent and the Belgian Subsidiary

The allegations contained in the Amended Complaint regarding personal jurisdiction over the Parent and the Belgian Subsidiary are:

> [The Parent and Belgian Subsidiary,] through their own dominion or control and actions and/or their agent-subsidiaries' dominion and control and actions, and/or their control and dominion of AGFA Graphics Division and

instrumental use of their agent subsidiaries, . . . have aided or abetted each other in committing and/or directly or indirectly committed tortious, illegal or injurious acts, or otherwise have transacted business and contracted to supply services in Delaware within the scope of Delaware's long arm statute, 10 Del. C. § 3104. [The Parent and Belgian Subsidiary] ha[ve] minimum contacts with Delaware that relate directly to this controversy such that personal jurisdiction over them will not violate Constitutional due process, and it is fair and reasonable for this Court to assert personal jurisdiction over them.

Upon information and belief, by or through conduct, coordination, supervision or their dominion and control of the AGFA Graphics Division, [the Parent] and/or [the Belgian Subsidiary] have maintained systematic and continuous contacts with [the Parent]'s wholly owned subsidiary [the Delaware Subsidiary], a Delaware corporation. Upon information and belief, [the Parent] and/or [the Belgian Subsidiary] have exerted and continue to exercise dominion and control over [the Delaware Subsidiary], directing it, for example, to negotiate and sell or provide to DuPont its joint marketing, promotion, sales and distribution capabilities and services regarding the DuPont Cyrel® Products AGFA Agreement (*see infra* Ex. D).

Further, [the Parent and Belgian Subsidiary] ha[ve] committed, or ha[ve] aided and abetted each other in committing or causing tortious conduct directed at DuPont, a Delaware corporation, and thus this Court may exercise jurisdiction over AGFA-Europe for this additional reason[.]

(Id. ¶¶ 15-17.)

## II. THE PARENT AND BELGIAN SUBSIDIARY'S MOTION TO DISMISS

The Parent and Belgian Subsidiary aver that the allegations in the Amended Complaint are conclusory and insufficient to demonstrate either specific or general personal jurisdiction. They urge that because I do not have personal jurisdiction over either of them, they should be dismissed from this case.

In response to the Motion to Dismiss, DuPont requested jurisdictional discovery, which I granted. The parties engaged in the ordered jurisdictional discovery, and DuPont has now submitted numerous exhibits that it believes establish personal jurisdiction over the Parent and

Belgian Subsidiary. I held oral argument on May 10, 2018 where DuPont further directed my attention to particular exhibits within its extensive submissions.

The parties seem to agree that I must resolve the jurisdiction issue before addressing DuPont's Motion for a Temporary Restraining Order and Preliminary Injunction. Because "[a] district court cannot enjoin a party if it does not have jurisdiction over that party," I will address the Motion to Dismiss first. See Celgard, LLC v. LG Chem, Ltd., 624 F. App'x 748, 751 (Fed. Cir. 2015).

## A. **Legal Standard**

When reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002). However, "[o]nce a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction." Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc., 295 F. Supp. 2d 400, 403 (D. Del. 2002) (citing Provident Nat'l Bank v. California Federal Sav. & Loan Assoc., 819 F. 2d 434, 437 (3d. Cir. 1987)). They may do so through sworn affidavits or other competent evidence. Parker v. Learn Skills Corp., 530 F. Supp. 2d 661, 670 (D. Del. 2008) (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.3d 61, 66 n.9 (3d Cir. 1984)). A plaintiff "is required to respond to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction with actual proof, not mere allegations." Id.

To meet this burden, DuPont must show that (1) the Delaware long-arm statute authorizes jurisdiction over the Parent and Belgian Subsidiary, and (2) the exercise of personal jurisdiction

comports with constitutional Due Process. <u>Nespresso USA, Inc. v. Ethical Coffee Co. SA</u>, 263 F. Supp. 3d 498, 502 (D. Del. 2017). The Delaware long-arm statute is construed broadly "to confer jurisdiction to the maximum extent possible under the Due Process Clause," thus DuPont need not put forward any additional evidence that the long-arm statute authorizes jurisdiction over the Parent and Belgian Subsidiary.[9] <u>Id.</u>

As to the second requirement, "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Id.</u> at 503 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)). This "minimum contacts" doctrine can be met through a showing of "general jurisdiction" or "specific jurisdiction." <u>Id.</u>

"A court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum State." <u>Daimler AG v. Bauman</u>, 134 S. Ct. 746, 754 (2014) (quoting <u>Int'l Shoe Co.</u>, 326 U.S. at 317).

A corporation's "principal place of business" and state of incorporation are "paradigm" bases for finding general jurisdiction with respect to corporations. <u>Id.</u> at 760. However, other "substantial, continuous, and systematic" contacts with a forum state may form the basis for

---

[9]     The <u>Nespresso</u> court noted that "Delaware law is . . . unclear as to whether or not the long arm statute is coextensive with the due process clause," and thus whether separate analyses are required. <u>Nespresso USA, Inc. v. Ethical Coffee Co. SA</u>, 263 F. Supp. 3d 498, 502 n.2 (D. Del. 2017) (citing <u>Commissariat A L'Energie Atomique v. Chi Mei Optoelecs. Corp.</u>, 395 F.3d 1315, 1322 (Fed. Cir. 2005)). Because Defendants have not challenged jurisdiction under the Delaware long-arm statute, I do not need to resolve this issue and instead focus my attention on the constitutional analysis.

general jurisdiction if they are of such a nature and degree to render the defendant essentially at home in the forum State." Id. at 761 (internal quotations and citation omitted).

Specific jurisdiction refers to the authority to hear cases in which "the suit aris[es] out of or relate[s] to the defendant's contacts with the forum." Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984). This type of personal jurisdiction exists where (1) "the defendant has 'purposefully directed' his activities at residents of the forum, and (2) "the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King v. Rudzewicz, 471 U.S. 462, 476 (1985) (citations omitted).

Regarding the first step, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780, 2788 (2011) (alteration in original) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 112 (1987)). Purposeful availment may be shown when an out-of-state defendant has set up offices in, pays taxes to or owns property in the forum state, and has sent employees to the forum state. See McIntyre, 131 S. Ct. at 2790. It can also be shown where an out-of-state defendant has registered to do business in the forum state or holds bank accounts in the forum state. See Goodyear, 131 S. Ct. at 2852.

### B. **Analysis**

The Parent and Belgian Subsidiary maintain that the jurisdictional allegations in the Amended Complaint are conclusory and the subsequent information submitted by DuPont

through briefing fails to supply the necessary facts to establish personal jurisdiction. They provide the following uncontested information in support of their position:

- The Parent and Belgian Subsidiary are both headquartered in Mortsel, Belgium;

- Neither the Parent nor the Belgian Subsidiary owns or leases any real estate in Delaware or anywhere else in the United States;

- The Parent is the parent company of almost 100 subsidiaries and "does not export any products into Delaware or elsewhere in the United States"; and

- The Belgian Subsidiary supplies products to the Delaware Subsidiary that "are manufactured in other regions, such as equipment, industrial inks, and prepress consumable products," none of which are at issue in this litigation.

(Defs.' Mot. at 14-15; Santomassimo Decl., Doc. No. 60, at ¶¶ 7-10, 16, 52.) In light of these facts, the Parent and Belgian Subsidiary submit that they have not purposefully availed themselves of this jurisdiction and should be dismissed from this lawsuit.

DuPont presents three theories to establish personal jurisdiction over the Parent and Belgian Subsidiary. Importantly, I note that none of these theories allege that either the Parent or Belgian Subsidiary directly availed itself of this jurisdiction. DuPont first argues that personal jurisdiction is established because the Parent and Belgian Subsidiary are bound by the US Agreement entered into by their "agent and subsidiary"—that is, the Delaware Subsidiary— through their involvement in the US Agreement. Second, DuPont asserts that the Parent and Belgian Subsidiary "dominate and control" the Delaware Subsidiary and are therefore subject to personal jurisdiction based on the actions of the Delaware Subsidiary. Finally, DuPont contends that "AGFA" ignores corporate formalities and I should pierce the corporate veil to find that the Parent and Belgian Subsidiary are subject to jurisdiction. I address each argument below.

1. <u>The Belgian Subsidiary</u>

DuPont does not specify whether it believes I have general or specific personal jurisdiction over the Belgian Subsidiary. In order for a court to assert general jurisdiction over a foreign corporation, that corporation's affiliations with the jurisdiction must be "'so continuous and systematic' as to render them essentially at home in the forum." <u>Daimler AG</u>, 134 S. Ct. at 754 (quoting <u>Int'l Shoe. Co.</u>, 326 U.S. at 317). The Supreme Court observed in <u>Daimler</u> that "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" <u>Id.</u> at 760 (citation omitted).

Here, the Belgian Subsidiary is incorporated in Mortsel, Belgium and has its principal place od business there. (Am. Compl. ¶ 4.) DuPont does not point to additional contacts with Delaware that are so "continuous or systematic" that the Belgian Subsidiary can be said to be "essentially at home" in Delaware.[10] As such, DuPont has not presented the contacts required to establish general personal jurisdiction over the Belgian Subsidiary. I will therefore assess DuPont's three theories through the lens of a specific personal jurisdiction analysis and determine whether they show that the Belgian Subsidiary "'purposely directed' [its] activities at residents of the forum." <u>See</u> <u>Burger King</u>, 471 U.S. at 476.

*a. Theory 1*

DuPont first contends that personal jurisdiction over the Belgian Subsidiary is established because the Belgian Subsidiary is bound and liable under the US Agreement entered into by its "agent," the Delaware Subsidiary. At oral argument, DuPont clarified this theory and focused its

---

[10] To the extent that DuPont believes general personal jurisdiction is established under a "doing business" theory, the Supreme Court rejected this argument in <u>Daimler</u>. 571 U.S. at 135-36 (observing that the circuit court's agency theory "appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the 'sprawling view of general jurisdiction' we rejected").

argument on the Belgian Subsidiary's involvement in (1) the acquisition of Pitman and assignment of the US Agreement, and (2) subsequent administration of the Pitman business and US Agreement. (N.T. 5/10/2018 at 32-51.) DuPont cites to Publicker Industries, Inc. v. Roman Ceramics, Inc., 652 F.2d 340 (3d Cir. 1981), Delcon (S.C.), Inc. v. Giant Cement Co., No. 87-7180, 1989 WL 54053 (E.D. Pa. May 18, 1989), and American Eagle Outfitters, Inc. v. Lyle & Scott Ltd., No. 06-607, 2007 WL 1202760 (W.D. Pa. Apr. 12, 2007), in support of this theory.

In Publicker, the United States Court of Appeals for the Third Circuit considered whether a parent company could be held liable on a contract entered into by its subsidiary to purchase whiskey bottles. 652 F.2d at 341. The district court concluded that the parent was directly liable under the contract, and, alternatively, that the parent was acting as an agent for its subsidiary. Id. at 342. These conclusions were based on the following facts: letters from buyer representatives that were intended to give the reader "'the clear impression that [the parent] was the main force in this situation'"; when the seller demanded action in response to the buyer's nonperformance of the agreement, it was the parent company that initially attempted to resolve the issue; the original complaint filed by the parent and the subsidiary stated that it was the parent that had agreed to buy the bottles and that it was the parent that had paid a settlement; the complaint referred to both the parent and subsidiary as selling products; and the pretrial memorandum described two occasions where both the parent and the subsidiary agreed to purchase the bottles. Id. Based on these facts, the district court stated that the parent was the "moving force" throughout the negotiation and performance of the contract. Id. In affirming the district court, the Third Circuit found that the parent could be held directly liable on the contract to purchase the whiskey bottles because the parent's "entire course of conduct throughout the negotiation, renegotiation, and

partial performance of the aborted transaction manifested [the parent's] agreement to bear direct liability." Id. at 344.

Publicker involved a principal/agent analysis of liability and did not discuss personal jurisdiction. Id. at 343 ("Before us now is solely the question whether the district court's findings support its conclusion that Publicker bore direct liability on the . . . contract."). Additionally, the Third Circuit did not address whether the alternate agency theory under which the district court found the parent to be liable extended to a sister subsidiary company. It is thus difficult to understand how Publicker impacts my analysis here.

DuPont next cites to Delcon, a district court case where a jury found a parent company liable on a contract entered into by a subsidiary. 1989 WL 54053, at *1. In upholding the verdict, the Delcon court cited Publicker "as standing for the equitable proposition . . . that where apparent agency has been shown by the evidence, the parent and subsidiary may both be deemed bound by the contract and sued independently." Id. at *5. The court concluded that it was within the ambit of the jury to determine whether the subsidiary was the apparent agent of the parent when it entered the contract. Id. It pointed out that facts had been presented to the jury showing that the chairman of the subsidiary's board also served as senior vice president of the parent and chairman of another related entity, as well as evidence that the parent was "as much directly involved" in the operation agreed to in the contract at issue. Id. at *4. But, like in Publicker, the Delcon court did not address personal jurisdiction or whether the agency theory on which the parent was held liable extended to a sister subsidiary.

Finally, DuPont relies upon American Eagle Outfitters, a district court opinion that DuPont suggests follows Publicker and Delcon. 2007 WL 1202760, at *4. In American Eagle Outfitters, the court asserted personal jurisdiction over a foreign parent company and its local

subsidiary under an agency theory, finding that the parent and subsidiary had sufficient contacts with the forum, evidenced by: documents showing both the parent and subsidiary were in contact with American Eagle regarding the underlying trademark dispute; documents showing both the parent and subsidiary were in contact with American Eagle regarding an attempted resolution through a coexistence agreement (an agreement by which both companies would use the logo at issue along with safeguards to avoid customer confusion); the fact that the coexistence agreement was intended to create a "long-term relationship"; and the parent and subsidiary's "use of their contacts" to negotiate the agreement and modify terms. Id. at *3. Observing that the facts presented were "materially indistinguishable from the ones in Publicker," the court concluded that the parent was the "moving force" behind the purported agreement, and held that the agency and related principles addressed in Publicker supported an exercise of personal jurisdiction over the parent and subsidiary. Id. at *4.

While the district court in American Eagle Outfitters court purported to apply Publicker's discussion of agency principles, the Publicker decision did not address whether a foreign corporation could be subject to personal jurisdiction under an agency theory. Rather, as noted by another court in this circuit, the issue before the Publicker court was the liability of a parent corporation for a contract breached by its subsidiary, and "the issue of liability is a discrete issue completely separate from the question of personal jurisdiction." Sprague Energy Corp. v. Union Drawn Steel II, Ltd., No 07-962, 2008 WL 696911, at *5 (W.D. Pa. Mar. 12, 2008) ("Because the Publicker holding addresses the substantive issue of liability of a parent corporation for the conduct of a subsidiary, the Plaintiff's reliance on Publicker in support of personal jurisdiction over [the parent] is misplaced.").

I agree with the <u>Sprague</u> court's reasoning that "the issue of liability is a discrete issue completely separate from the question of personal jurisdiction," and therefore find <u>Publicker</u> inapplicable. <u>See id.</u> at *5. Moreover, none of the cases to which DuPont cites address whether a court may assert personal jurisdiction over a foreign sister subsidiary under the purported agency theory. Rather, courts in this district appear to focus on the degree of control exercised by a foreign entity when determining whether an agency theory establishes personal jurisdiction (discussed <u>infra</u>). <u>See E.I. Du Pont de Nemours & Co. v. Heraeus Holding GmbH</u>, No. 11-773, 2012 WL 4511258, at *13 (D. Del. Sept. 28, 2012) ("The central factual issue, in determining whether a subsidiary corporation is an agent . . . is one of control: whether the . . . corporation dominates the activities of the subsidiary."). Having found none of DuPont's cases applicable here, I will turn to DuPont's second theory.

   b. *Theory 2*

DuPont next argues that the Belgian Subsidiary "dominates and controls" the Delaware Subsidiary and is therefore subject to personal jurisdiction based on the actions of "its wholly owned and controlled subsidiary in the United States as its sales arm." I find no merit in this theory.

This theory has been analyzed in multiple cases in the parent-subsidiary context. Courts in this district consider the following factors in determining whether an agency relationship exists such that a parent corporation dominates and controls its subsidiary: "the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business." <u>See Rovi Corp. v. Haier Grp. Corp.</u>, No. 11-1140, 2013 WL 4534641, at *3 (D. Del. Aug. 23, 2013) (quoting <u>Applied Biosystems, Inc. v. Cruachem, Ltd.</u>, 772 F. Supp. 1458, 1463 (D. Del. 1991)). "No one

factor is either necessary or determinative; rather it is the specific combination of elements which is significant." Id. (quoting Applied Biosystems, Inc., 772 F. Supp. at 1463). However, the fact that "a parent and a subsidiary have common officers and directors [does not] necessarily indicate an[] agency relationship," and "[t]he fact that a parent corporation finances the operations of a subsidiary is not sufficient to support a finding that the subsidiary is a mere agent or instrumentality of the parent." Id. n.8.

Where, like the situation here, the entities at issue are in a sister subsidiary relationship, and not a parent-subsidiary relationship, courts look at whether the two companies are "corporate affiliates with close business ties." See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 863 F. Supp. 186, 189 (D. Del. 1993); see also Pfizer Inc. v. Mylan Inc., 201 F. Supp. 3d 483, 489 (D. Del. 2016) (acknowledging that an agency theory could apply to two companies where those companies are "'two arms of the same business group,' [that] operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

In Wesley-Jessen, the court found an agency relationship existed between two subsidiaries based on the following facts: both subsidiaries were owned by the same parent corporation; the subsidiaries "apparently operate[d] in lockstep as part of a larger . . . business group"; affidavits showed that the business strategies and financial statements of the subsidiaries were analyzed as a unit; the subsidiaries presented themselves as "a unified entity to their employees and to the marketplace"; and although the Delaware subsidiary owned multiple patents related to the technology at issue and performed the relevant research, the foreign subsidiary agreed in a written contract to indemnify the Delaware subsidiary in all patent suits arising out of sales of the relevant product. 863 F. Supp. at 189. As to the last fact, the court observed that "it seems unlikely that truly independent companies would come to such an

arrangement." Id. That tasks were divided between the two subsidiaries was of no matter to the

court, which found that "[f]or the purpose of jurisdiction, [the foreign and Delaware subsidiaries]

may be considered two arms of the same business group in their attempt to achieve the common

goal of selling lenses in Delaware and other markets." Id.

In an attempt to align the case before me with Wesley-Jessen, DuPont lists the following

facts as evidence that the Belgian Subsidiary dominates and controls the Delaware Subsidiary:

- The Parent and its subsidiaries, including the Belgian Subsidiary and the Delaware Subsidiary, have consolidated financial statements;

- Officers of the Delaware Subsidiary report to executives of the "European Defendants";

- There are "solid reporting lines" from the President of the Delaware Subsidiary to the President of the Belgian Subsidiary to the CEO of the Parent;

- There are solid reporting lines from the Delaware Subsidiary's CFO and Head of Operations "up through" the Belgian Subsidiary;

- The Parent instituted a policy "that the ultimate parent of each of its businesses owns and manages" all of the intellectual property;

- The Delaware Subsidiary assigned ownership of its Pitman trademarks to the Belgian Subsidiary; and

- The global Agfa Graphics business is administered and centrally controlled through the Belgian Subsidiary and its President, Stefaan Vanhooren, who is also chairman of the global GMC.[11]

---

[11]   DuPont notes the following additional factors, which are relevant to only the Parent and will be discussed infra: "AGFA" holds itself out as a globally integrated company; Pitman was purchased to increase the presence of global Agfa Graphics business in the United States and to "become the strongest general distributor in the US Printing industry"; "Agfa is commercially active worldwide through wholly owned sales organizations in more than 40 countries" and the Delaware Subsidiary is referred to as the "Sales Office" for the global Graphics business group; "Agfa Graphics revenue increase mainly comes from the USA and emerging countries"; "the Foreign Defendants" hold "AGFA's" monetary assets, such that the Delaware Subsidiary needs permission to make withdrawals; and the "Foreign Defendants" dominate the Delaware Subsidiary decision making through consideration of business in the United States by the global GMC and by direct communication with the Delaware Subsidiary.

(Pl.'s Resp. at 18-19.)

For the following reasons, I find that none of the above-listed facts support a conclusion that the Belgian Subsidiary and Delaware Subsidiary have "close business ties" such that they operate in "lockstep."

First, the financial statements are not configured in a way that reflects that the subsidiaries operate in concert. Gunther Mertens, who was previously CFO of the Delaware Subsidiary, acknowledged at his deposition that the Parent and its subsidiaries, including the Belgian Subsidiary and the Delaware Subsidiary, have consolidated financial statements. Mr. Mertens explained that there were global financial reporting obligations, and his financial reports to the vice president of finance and administration were consolidated "for reporting to investors, and the stock market, and so on." (Defs.' Reply, Ex. 1, 90:1-18.) But, unlike in Wesley-Jessen, DuPont has not submitted any other evidence demonstrating that the business strategies and financial statements of the Belgian Subsidiary and Delaware Subsidiary were consolidated so that the subsidiaries could operate as one.

DuPont next stresses that officers of the Delaware Subsidiary report to executives of the "European Defendants," there are "solid reporting lines" from the President of the Delaware Subsidiary to the President of the Belgian Subsidiary to the CEO of the Parent, and there are "solid reporting lines" from the Delaware Subsidiary's CFO and Head of Operations "up through" the Belgian Subsidiary. But these assertions are mere conclusions, based almost entirely on organizational charts. (Pl.'s Resp., Exs. 27; 20; 75; 28; 19; 76; 77.) The simple fact that there are lines on a chart connecting various persons does not make the requisite showing that officers at the Delaware Subsidiary were actually reporting to officers at the Belgian Subsidiary such that I can conclude that the Belgian Subsidiary officers were directing the

Delaware Subsidiary's business. Significantly, these charts do not in any way indicate that the reporting to Mr. Stefaan Vanhooren (President of the Belgian Subsidiary) or Mr. Ronald Dockx (CFO of the Belgian Subsidiary) was done through their roles for the Belgian Subsidiary. Rather, it appears that the reporting was in their capacity for the Graphics business group and/or on the GMC. (E.g., id., Ex. 28.) The only other document DuPont references is an email where Mr. Mertens (who was the President of the Delaware Subsidiary) referred to Mr. Vanhooren as his "boss." (Id., Ex. 78.) Importantly, in the email, Mr. Mertens introduces himself to a person at DuPont as "the Regional President of Agfa Graphics in North America" and then states that Mr. Vanhooren is based at "our HQ in Belgium." The context of the email suggests that Mr. Mertens was referring to Mr. Vanhooren's role for the Graphics business group and/or the GMC, and not in his role as President of the Belgian Subsidiary.[12]

DuPont also alleges that the Parent instituted a policy "that the ultimate parent of each of its businesses owns and manages" all of the intellectual property, and that the Delaware Subsidiary assigned ownership of its Pitman trademarks to the Belgian Subsidiary. In support, DuPont cites to the "Assignment and Assumption Agreement," whereby the Delaware

---

[12]     In contrast to DuPont's assertion that there are "solid reporting lines" from the Delaware Subsidiary's CFO and Head of Operations "up through" the Belgian Subsidiary, Mr. Mertens testified at his deposition that when he was CFO of the Delaware Subsidiary he largely reported to the president of the Delaware Subsidiary. He stated that there was a "dual reporting line" for his position because ninety-percent of his job dealt with local matters of the Delaware Subsidiary but the remainder of his job required him to report the financials of the Delaware Subsidiary to the vice president of finance and administration in Belgium. Mr. Mertens explained that there were global financial reporting obligations, and his financial reports to the vice president of finance and administration were consolidated "for reporting to investors, and the stock market, and so on." Thus it was only the portion of his job pertaining to global financial reporting that he was responsible to report to "headquarters." Moreover, Mr. Mertens named Mr. Dockx as the vice president of finance and administration in Belgium, not as CFO of the Belgian Subsidiary. (Defs.' Reply, Ex. 1, 89:11-24, 90:1-18, 167:19-24, 168:1-6.)

Subsidiary assigned the Pitman trademarks to the Belgian Subsidiary.[13]  (Id., Ex. 95.)  Although the agreement refers to "Agfa Graphics NV" (the Belgian Subsidiary) as an ultimate parent of its business, it also clearly states that the Parent is the "ultimate parent" of both the Belgian Subsidiary and the Delaware Subsidiary.  (See also id., Ex. 7 at AGFA0121.)

DuPont also points to a document titled "Global Policy on Ownership and Sharing of Intellectual Property Rights within the Agfa Group," which states that "[a]ll IP produced by a department of the Graphics [business group] is owned by [the Belgian Subsidiary]."  (Id., Ex. 85.)  But, "ownership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state."[14]  See Nespresso, 263 F. Supp. 3d at 504.

DuPont's final contention is that the global Agfa Graphics business is administered and centrally controlled through the Belgian Subsidiary and its President, Mr. Vanhooren.  While the Belgian Subsidiary coordinates the activities of other graphics subsidiaries, importantly, it does not do so with the Delaware Subsidiary, which remains a direct subsidiary of the Parent.  (Defs.' Reply, Ex. 17.)  Additionally, although Mr. Vanhooren is the President of the Belgian Subsidiary, he is also President of the Graphics business group, chair of the GMC, and chairman of the Delaware Subsidiary's board.[15]

---

[13]  The agreement states that "[The Parent], the ultimate parent of both Assignor and Assignee, has concluded that it and its affiliates and subsidiaries benefit from centralized ownership and management of intellectual property related to trademarks and trade names and has therefore instituted a corporate policy that the ultimate parent of each of its businesses owns and manages all of the intellectual property related to trademarks and trade names of the respective businesses."  (Pl.'s Resp., Ex. 95.)

[14]  Moreover, as noted above in footnote 8, assignment of the '759 Patent has since been transferred to the Delaware Subsidiary.

[15]  Many of the documents submitted by DuPont show Mr. Vanhooren and Mr. Dockx's names on emails related to the Pitman business.  At his deposition, Mr. Vanhooren testified at

DuPont has not presented sufficient facts tying the business of the Belgian Subsidiary and the business of the Delaware Subsidiary together such that personal jurisdiction is established over the Belgian Subsidiary. The Belgian Subsidiary and the Delaware Subsidiary did not have an indemnity agreement between them or manufacture one another's products like the subsidiaries in <u>Wesley-Jessen</u>. The Belgian Subsidiary operates in Belgium and is involved in research and development related to the graphics industry, negotiation of raw materials contracts, and manufacturing equipment, among other things. The Delaware Subsidiary, on the other hand, manufactures, markets, and sells its own products out of its principal place of business in

---

length that his involvement in the Pitman deal was largely in his capacity as chairman of the Delaware Subsidiary's board. (Defs,' Reply, Ex. 3, 74:13-77:18.) It is also true that Mr. Vanhooren exchanged emails with Peter Wilkins and Gunther Mertens, or some combination of Christian Reinaudo, Kris Hoornaert, Wilfried Van Lishout, and Ronald Dockx, all of whom are members of either the GMC, the ExCo, or are corporate officers for the Parent. However, the content and context of the emails strongly suggests that Mr. Vanhooren was communicating in his capacity as President of the GMC or chairman of the Delaware Subsidiary's board, and Mr. Dockx was communicating in his role as Vice President of Finance for the GMC. This is evidenced by the fact that Mr. Vanhooren's signature block actually indicated his role as President of the Graphics business group and included links to either the website www.agfa.com or http://www.agfa.com/graphics/. (<u>See</u> e.g., Pl.'s Resp., Ex. 31 at AGFA8116, AGFA8109-10, AGFA8098; <u>id.</u>, Ex. 66 at AGFA8215, AGFA8219.)

Similarly, DuPont provides documents where Mr. Dockx's signature block reads "Agfa Graphics, VP of Finance & Accounting," which was his role for the GMC and not for the Belgian Subsidiary. (<u>E.g.</u>, <u>Id.</u>, Ex. 31 at AGFA8093.) Not one of the emails suggests that Mr. Vanhooren or Mr. Dockx were involved in the Pitman business on behalf of the Belgian Subsidiary.

DuPont has also provided a document titled "Delegation of powers of the President," which confers power of approval on the President of the Belgian Subsidiary as to "[the Belgian Subsidiary], its branches, and its subsidiaries." The document goes on to state that "given the separate legal status of [the Belgian Subsidiary's] subsidiaries, none of the sections in this document apply directly to such subsidiaries." While the document does discuss the ability of the President of the Belgian Subsidiary to delegate to GMC members, the introduction specifically states the President's power of approval applies only to "[the Belgian Subsidiary], its branches, and its subsidiaries." (<u>Id.</u>, Ex. 13 at AGFA2185-95.) Critically, the Delaware Subsidiary was not a subsidiary of the Belgian Subsidiary but always remained a subsidiary of the Parent. (Defs.' Reply, Ex. 17.)

Elmwood, New Jersey, and sometimes resells products manufactured by other parties in the printing and publishing industries in the United States. (Defs.' Mot., Santomassimo Decl., Doc. No. 60, at ¶¶ 10, 14, 24.) While the Belgian Subsidiary does coordinate the activities of other graphics subsidiaries, it notably does not do so with the Delaware Subsidiary, which remains a direct subsidiary of the Parent and maintains its own manufacturing plant unlike some of the other subsidiaries.[16] (Defs.' Reply, Ex. 17; id., Ex. 2, 73:9-24.)

In light of the discussion above, I conclude that DuPont has not put forward sufficient evidence to show that the Belgian Subsidiary and the Delaware Subsidiary operate as "two arms

---

[16] To the extent DuPont contends the Belgian Subsidiary dominated and controlled the Delaware Subsidiary because of its involvement in the acquisition of Pitman and the US Agreement, the following facts, supplied by Defendants and supported by the record, belie such a contention: the Delaware Subsidiary acquired Pitman in 2010 and as part of the acquisition, DuPont consented to transfer its distribution agreement with Pitman to the Delaware Subsidiary; Pitman's business was failing, and as the Delaware Subsidiary's largest distributor, it was in the Delaware Subsidiary's interest to ensure continued access to its customers; the US Agreement was born from a contract originally entered into between DuPont and Pitman; the US Agreement was signed by Mr. Mertens as President of the Delaware Subsidiary, defines "AGFA" as "Agfa Corporation" (the Delaware Subsidiary), and does not mention any other AGFA entity; the Delaware Subsidiary executed all contracts relevant to the deal as the legal entity "Agfa Corporation," and the Delaware Subsidiary was the only entity that obtained DuPont's initial consent, and then negotiated and administered all subsequent renewals of the agreement; the US Agreement was renewed on a biennial basis until 2016, and the Delaware Subsidiary was the only entity that operated under the US Agreement throughout its effective period; it was the Delaware Subsidiary's idea to acquire Pitman after Pitman contacted Peter Wilkens (President of the Delaware Subsidiary at the time); the Delaware Subsidiary's team of officers and employees conducted the due diligence for the deal, worked out the terms of the deal with Pitman, and negotiated with Pitman's other suppliers including DuPont; and Mr. Vanhooren was involved in the acquisition in his role of chairman of the Delaware Subsidiary's board and due to the size of the acquisition. (Defs.' Mot. at 5-6; Santomassimo Decl., Doc. No. 60, at ¶¶ 34, 33, 35, 39, 41-42, 38, 45, 37; Defs.' Reply at 3-4; id. Ex. 1, 284:13-15, 284:17-285:8, 285:10-12, 285:13-186:18-22, 286:24-287:4, 287:6-11, 287:13; id., Ex. 2, 23:11-21, 26:14-21; id., Ex. 3, 74:13-16, 75:17-22, 75:23-77:18, 77:7-16, 81:5-21; id., Ex. 4, 15:5-17; id., Ex. 6; x. 8; Ex. 9; Pl.'s Resp., Ex. 21.)

of the same business group," in "lockstep," or as a "unified" entity. I thus find that the Delaware Subsidiary was not acting as the Belgian Subsidiary's agent under DuPont's second theory.[17]

####  c. *Theory 3*

Finally, DuPont contends that "AGFA" ignores corporate formalities and that I should therefore pierce the corporate veil to establish personal jurisdiction. DuPont further argues that a showing of fraud is not required to advance this theory.

To state a veil-piercing claim under Delaware law, a plaintiff must "plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors or creditors." Robinson Mech. Contractors Inc. v. PTC Grp. Holdings Corp., No. 15-77, 2017 WL 2377509, at *5 (E.D. Mo. June 1, 2017) (citing Doberstein v. G-P Indus., Inc., No. 9995, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015)). Delaware courts consider the following factors when deciding whether to disregard the corporate entity: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." Id. "No single factor is dispositive, and generally there must be some combination of them, and there must be an overall element of injustice or unfairness present." Id. (internal quotations and citation omitted). In addition, "'a court may disregard the corporate form in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation . . . are involved.'" Marnavi S.p.A. v. Keehan, 900 F. Supp. 2d 377,

---

[17]     The remaining eight cases provided by DuPont pertain only to parent-subsidiary agency relationships and are therefore inapplicable.

392 (D. Del. 2012) (quoting <u>Maloney-Refaie v. Bridge at Sch., Inc.</u>, 958 A.2d 871, 881 (Del. Ch. 2008)).

DuPont has failed to provide facts relevant to the above-listed factors. Nor has DuPont presented any evidence suggesting fraud or a public wrong. The only facts supplied by DuPont are that there are no shareholder consents, formal documents, or corroborating testimony that formal delegations of authority and corporate policies are voluntary and not binding on the Delaware Subsidiary. As to its last point, DuPont appears to be referring to formal delegations of authority from the Parent to different subsidiaries and formal corporate policies that control those subsidiaries. DuPont urges that because officers of the Delaware Subsidiary testified at their depositions that these delegations of authority and corporate policies were "voluntary" and therefore not binding on the Delaware Subsidiary, the Delaware Subsidiary somehow ignores corporate formalities. Additionally, DuPont contends that the Delaware Subsidiary's structure permits directors to fire other directors, which violates Delaware corporate law. DuPont does not explain how these facts pertain to the factors listed above, nor does it explain how a violation of Delaware corporate law is equivalent to ignoring corporate formalities.

In response, Defendants explain that global policies were adopted by subsidiaries only where appropriate, and none of the global policies were mandatory, but rather were subject to local acceptability. (Defs.' Reply, Ex. 1, 204:2-13, 209:17-24, 210:1-11, 221:3-5; <u>id.</u>, Ex. 3, 43:3-11; Pl.'s Resp., Ex. 71, 31:7-10, 43:24-45:1.) Additionally, Defendants assert that it is permissible for a parent company to set policies for subsidiaries. <u>See</u> <u>Nespresso</u>, 263 F. Supp. 3d at 505. Defendants also point to the following facts: the Delaware Subsidiary is validly incorporated; the Delaware Subsidiary elects its own officers and directors; the Delaware Subsidiary holds regular board meetings and prepares minutes; the Delaware Subsidiary

maintains detailed records in a minute book; the Delaware Subsidiary enacted by-laws; the Delaware Subsidiary issued share certificates; the Delaware Subsidiary enters into contracts in its own name; the Delaware Subsidiary files tax returns in its own name; the Delaware Subsidiary maintains corporate records; and the Delaware Subsidiary has its own corporate checking account. (Santomassimo Decl. at ¶¶ 20, 22-23, 25; Defs.' Reply, Ex. 11; id., Ex. 12; id., Ex. 2, 78:4-6, 34:24-35:8, 92:21-93:11, 46:2-11, 93:15-94:12, 144:7-18, 41:9-13; id., Ex. 13; id., Ex. 3, 68:7-9; id., Ex. 15; id., Ex. 14; id., Ex. 15 at AGFA1909-18.)

DuPont appears to conflate the Belgian Subsidiary and the Parent. Of the three cases to which DuPont cites—Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (Del. Ch. 1987), Robinson Mech. Contractors Inc. v. PTC Grp. Holdings Corp., No. 15-77, 2017 WL 2377509 (E.D. Mo. June 1, 2017), and Pauley Petroleum Inc. v. Cont'l Oil Co., 239 A.2d 629 (Del. 1968)—only Irwin & Leighton, Inc. and Pauley Petroleum Inc. address personal jurisdiction, and neither addresses whether a veil piercing theory applies to a sister subsidiary. Rather, they discuss only whether a parent can be subject to personal jurisdiction under a veil piercing theory.

In light of the above, I find that DuPont has failed to show that the Belgian Subsidiary is subject to personal jurisdiction under a veil piercing theory. DuPont has provided no authority suggesting that I may assert jurisdiction over a sister subsidiary under such a theory, and even if I could, DuPont has not pointed to any facts that demonstrate that the Delaware Subsidiary disregards corporate formalities.

2. The Parent

DuPont presses the same three jurisdictional theories for the Parent, although again does not specify whether it believes I have general or specific personal jurisdiction over the Parent.

The Parent is incorporated in Mortsel, Belgium and has its principal place of business there. (Am. Compl. ¶ 2.) DuPont does not point to any contacts with Delaware that are so "continuous or systematic" that the Parent can be said to be "essentially at home" in Delaware.[18]  As such, DuPont has not presented the contacts required to assert general personal jurisdiction over the Parent.  I will therefore again assess DuPont's three theories through the lens of a specific personal jurisdiction inquiry.

### a. Theory 1

Regarding DuPont's first contention, that personal jurisdiction over the Parent is established because the Parent is bound and liable under the US Agreement entered into by its "agent," the Delaware Subsidiary, DuPont again relies on Publicker, Delcon, and American Eagle Outfitters.

It is worth repeating that neither the Publicker nor Delcon court discussed personal jurisdiction.  Rather, those opinions addressed whether a parent can be liable on a contract entered into by its subsidiary.  I decline to follow the American Eagle Outfitters court's reliance on Publicker to establish personal jurisdiction over the Parent.  As aptly noted by the Sprague court, "the issue of liability is a discrete issue completely separate from the question of personal jurisdiction." Sprague Energy Corp., 2008 WL 696911, at *5.

### b. Theory 2

DuPont next argues that the Parent "dominates and controls" the Delaware Subsidiary and is therefore subject to personal jurisdiction based on the actions of the Delaware Subsidiary. Of the facts relied upon by DuPont and listed above in my discussion of DuPont's second theory

---

[18]     As previously noted, to the extent that DuPont believes general personal jurisdiction is established under a "doing business" theory, the Supreme Court rejected this argument in Daimler.  571 U.S. at 135-36.

as to the Belgian Subsidiary (see supra page 18), those that appear to be relevant to the Parent are:

- "AGFA" holds itself out as a globally integrated company;

- Pitman was purchased to increase the presence of the global Agfa Graphics business in the United States and to "become the strongest general distributor in the US Printing industry";

- The Parent and its subsidiaries, including the Belgian Subsidiary and the Delaware Subsidiary, have consolidated financial statements;

- "Agfa is commercially active worldwide through wholly owned sales organizations in more than 40 countries," and the Delaware Subsidiary is referred to as the "Sales Office" for the global Graphics business group;

- "Agfa Graphics revenue increase mainly comes from the USA and emerging countries";

- Officers of the Delaware Subsidiary report to executives of the "European Defendants";

- "The Foreign Defendants" hold "AGFA's" monetary assets, such that the Delaware Subsidiary needs permission to make withdrawals;

- There are "solid reporting lines" from the President of the Delaware Subsidiary to the President of the Belgian Subsidiary to the CEO of the Parent; and

- The "Foreign Defendants" dominate the Delaware Subsidiary decision making through consideration of business in the United States by the global GMC and by direct communication with the Delaware Subsidiary.

As stated above, in determining whether an agency relationship exists such that a parent corporation dominates and controls its subsidiary, Delaware courts consider the following factors: "[1] the extent of overlap of officers and directors, [2] methods of financing, [3] the division of responsibility for day-to-day management, and [4] the process by which each corporation obtains its business." See Rovi Corp., 2013 WL 4534641, at *3 (quoting Applied Biosystems, Inc., 772 F. Supp. at 1463). The fact that "a parent and a subsidiary have common

officers and directors [does not] necessarily indicate an[] agency relationship," and "[t]he fact that a parent corporation finances the operations of a subsidiary is not sufficient to support a finding that the subsidiary is a mere agent or instrumentality of the parent." Id. n. 8.

Turning to the first factor, the only overlap in officers and directors appears to be that Mr. Vanhooren and Kris Hoornaert were on the ExCo and the Delaware Subsidiary's board of directors. Importantly, the ExCo—the executive management team for the Parent—is distinct from the Parent's Board of Directors. (See Pl.'s Resp., Ex. 8 at AGFA5725.) Additionally, Delaware courts have held "such a tenuous connection" to be "minor overlap" and "not dispositive for finding agency. See, e.g., Nespresso, 263 F. Supp. 3d at 505 (citation omitted).

Regarding the second factor—financing—DuPont asserts that the Parent and its subsidiaries have consolidated financial statements, and "the Foreign Defendants" hold "AGFA's" monetary assets, such that the Delaware Subsidiary needs permission to make withdrawals. The documents to which DuPont cites to support this point are unavailing. First, DuPont focuses on a series of exhibits that are organizational charts that provide no information regarding the Delaware Subsidiary's monetary assets. (Pl.'s Resp., Exs. 27, 20, 75, 28, 19, 76, 77.) DuPont also provides a non-specific internal citation to Section II.A of its brief, where it reviews alleged ties between the Delaware Subsidiary and the Belgian Subsidiary, but not the Parent or monetary assets.

DuPont next points to the email where Mr. Mertens referred to Mr. Vanhooren as his "boss." (Id., Ex. 78.) This email appears to be entirely unrelated to the finances of the Delaware Subsidiary and certainly contains nothing that confirms that the Parent holds the Delaware Subsidiary's assets such that the Delaware Subsidiary needs permission to make withdrawals. In fact, the Delaware Subsidiary files tax returns in its own name, has its own corporate checking

account, and paid for the Pitman acquisition out of its own bank account. (Defs.' Reply, Ex. 15 at AGFA1909-18; id., Ex. 2, 144:4-18, 41:9-13.) While it may be true that the Parent and the Delaware Subsidiary have consolidated financial statements, in light of the otherwise dearth of evidence pertaining to overlap in the Parent and Delaware Subsidiary's financials, I find the consolidated statement to be unpersuasive of domination and control. See Nespresso, 263 F. Supp. 3d at 505 ("[R]egulatory filings present[ing] the assets, liabilities, and financial earnings of its subsidiaries as one indistinguishable whole' do not prove agency.") (citation omitted).

As for the last two factors—the division of responsibility for day-to-day management and the process by which each corporation obtains its business—DuPont has submitted no evidence that the Parent is responsible for any of the Delaware Subsidiary's day-to-day management, nor has DuPont provided evidence that the Parent obtains business for the Delaware Subsidiary. Rather, it was the Delaware Subsidiary's idea to acquire Pitman after Pitman contacted Mr. Wilkens, and the Delaware Subsidiary's team of officers and employees that conducted the due diligence for the deal, worked out the terms of the deal with Pitman, negotiated with Pitman's other suppliers such as DuPont, and ultimately signed the US Agreement. (Defs.' Reply, Ex. 3, 74:13-16, 75:17-22, 77:5-11; id., Ex. 4, 15:5-17; id., Ex. 2, 23:11-21; id., Ex. 6; id., Ex. 8; id., Ex. 9; Pl.'s Resp., Ex. 21.)) Additionally, the Delaware Subsidiary's officers managed the day-to-day affairs at the Delaware Subsidiary. (Id., Ex. 1, 285:13-286:16, 286:18-22, 286:24-287:4, 287:6-11, 287:13.)

The remaining facts to which DuPont points are largely irrelevant to the factors considered when deciding whether an agency relationship exists, and thus I will not address them in full. I respond only to DuPont's blanket assertion that the "Foreign Defendants" dominate the Delaware Subsidiary decision making through consideration of business in the United States by

the global GMC—the main policy-making body of the Agfa Graphics group—and by direct communication with the Delaware Subsidiary.

While DuPont referenced an extensive compilation of emails and meeting minutes where members of either the GMC or ExCo mentioned Pitman, DuPont overstates the significance of these documents. The emails and meeting minutes show that members of the GMC and ExCo were involved in three points along the timeline of the Pitman deal: (1) approval of the acquisition, (2) integration of the business once Pitman was acquired, and (3) monitoring of the business when the Delaware Subsidiary was not receiving the expected margins on the DuPont distribution. As Defendants state, the acquisition of Pitman was an $80 million deal—of course the Delaware Subsidiary needed approval from the Parent before acquiring a company for $80 million. (Defs.' Reply at 1; id., Ex. 2, 26:14-21; id., Ex. 3, 75:23-77:18.) It is also logical that the Parent was involved in the smooth integration of the Pitman business into the Delaware Subsidiary's business, which was part of the greater Graphics business. Finally, it makes sense that the Parent was monitoring the margins on the DuPont distribution. In February 2013, Mr. Vanhooren reported to the Delaware Subsidiary's board that a Chapter 11 filing was under consideration for "the U.S. graphics business" and thus "instructed the team to increase profitability and balance margin vs. volume in the pre-press business." In a subsequent meeting of the GMC, it was stressed that "better conditions . . . with DuPont" be negotiated. This same sentiment was then communicated in an email from Mr. Dockx to Mr. Wilkens. (Pl.'s Resp., Exs. 54, 44, 3.) In the context of an impending bankruptcy, it is unsurprising that the Parent was concerned with the margins returned on the DuPont distribution agreement.[19]

---

[19] DuPont also cites to two letters that it believes demonstrate that the Parent was controlling the deals with Pitman and DuPont. First, it cites to a letter sent from DuPont's North American Sales Director to Pitman's President that refers to Pitman being in discussions with

But these facts are hardly sufficient to find that the Parent dominated and controlled the Delaware Subsidiary such that personal jurisdiction is established. The Delaware Subsidiary handled its day-to-day business operations and rarely turned to its Parent. This is not a relationship that was dominated or controlled by the Parent.[20]

### a. Theory 3

Finally, DuPont again avers that "AGFA" ignores corporate formalities and that I should pierce the corporate veil to establish personal jurisdiction over the Parent.

DuPont relies on the same facts here as it does for the Belgian Subsidiary. As discussed in greater detail above, the facts pressed by DuPont—that is, that there are no shareholder consents, formal documents, or corroborating testimony that formal delegations of authority and corporate policies are voluntary and not binding on the Delaware Subsidiary—are not relevant to the factors I must consider. Rather, Defendants offer significant evidence establishing that the Delaware Subsidiary is validly incorporated, elects its own officers and directors, holds regular board meetings and prepares minutes, maintains detailed records in a minute book, enacted by-laws, issued share certificates, enters into contracts in its own name, files tax returns in its own

---

"Agfa-Gavaert NV" (the Parent) concerning an acquisition of Pitman. (Pl.'s Resp., Ex. 38.) Second, it cites to a subsequent letter sent by Mr. Wilkens to DuPont's North American Sales Director where Mr. Wilkens stated that "Agfa is excited about the prospects of a mutually beneficial relationship between DuPont and Agfa." (Id., Ex. 4.) While Mr. Wilkens perhaps unartfully referred generally to "Agfa," DuPont's assertion that this shows that the Parent was behind the deal is disingenuous. The subject line of Mr. Wilkens's letter read "Agfa Corporation/Pitman Asset Purchase" and the body of the letter referred to the Agfa/Pitman transaction. (Id.) And, as noted previously, the Delaware Subsidiary's officers conducted the due diligence, negotiated the Pitman deal, negotiated with DuPont, and entered the US Agreement with DuPont on behalf of only the Delaware Subsidiary. Moreover, the Delaware Subsidiary obtained DuPont's initial consent and signed all subsequent renewals of the US Agreement.

[20] The eight cases to which DuPont cites in support of its second theory are factually dissimilar from the case before me. Given that these cases are neither binding nor persuasive, I will not discuss them individually.

name, maintains corporate records, and has its own corporate checking account. (Santomassimo Decl., Doc. No. 60, at ¶¶ 20, 22-23, 25; Defs.' Reply, Ex. 11; <u>id.</u>, Ex. 12; <u>id.</u>, Ex. 2, 78:4-6, 34:24-35:8, 92:21-93:11, 46:2-11, 93:15-94:12, 144:7-18, 41:9-13; <u>id.</u>, Ex. 13; <u>id.</u>, Ex. 3, 68:7-9; <u>id.</u>, Ex. 15; <u>id.</u>, Ex. 14; <u>id.</u>, Ex. 15 at AGFA1909-18.)

Accordingly, I find that DuPont has not established sufficient facts "supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors or creditors."

### III.    <u>CONCLUSION</u>

For the foregoing reasons, I conclude that I do not have personal jurisdiction over either the Belgian Subsidiary or the Parent. Consequently, they are dismissed from this case. Defendants' Motion to Dismiss is granted, and I will deny as moot DuPont's Motion for a Temporary Restraining Order and Preliminary Injunction.

An appropriate Order follows.